Mr. Chief Justice, and may it please the Court, this Court has repeatedly failed to identify a justiciable standard for partisan gerrymandering claims. The cause of that failure is not a lack of judicial imagination or a lack of claims that the particular map before the Court was the most extreme ever. Rather, the root cause of this failure is the basic decision of the framers to give responsibility for congressional districting to political actors. The framers consciously chose to give the primary authority to state legislatures, and then to police the possibility that state legislatures, which the framers knew to be partisan institutions, would engage in too much partisanship, the framers chose a structural solution by giving the Federal Congress supervisory authority. Mr. Clement, that ship has sailed in Baker v. Carr. Once we decided the one person, one vote concept, we went pretty much in all of our jurisprudence saying that certain acts by the legislature are unconstitutional, including race discrimination and others. It can't be that simply because the Constitution says that a particular act is in the hands of one branch of government that that deprives the courts of reviewing whether that action is constitutional or not. Well, Justice Sotomayor, I suppose the question of whether that ship sailed in Baker v. Carr is one way of presenting the question before the Court today. And I would submit that you don't have a one-size-fits-all solution for justiciability, and I don't think Baker v. Carr supports that proposition. Indeed, I took the central lesson of Baker v. Carr to be that the same claim, essentially, when presented as an equal protection claim, was justiciable when the same claim presented as a Republican Guarantee Clause claim was not justiciable. But, Mr. Clement, does one person have one vote that counts equally, which I take it to be the message of those cases now well accepted? Does one person have one vote that counts equally with others if the impact of her vote is reduced based on her party affiliation? The answer to that question, Justice Ginsburg, is yes. You still have an equal right to vote as an individual. And what the parties on the other side are really complaining of here is not a purely individual injury. What they're complaining of is that they're grouped in a district with either too many people who agree with them or too few people who agree with them, and therefore their vote is sort of diluted in some way. And I don't think that is, in the first place, an individual legally cognizable interest. So I think they have a standing problem. But even if they get over the standing problem, then I don't think that's a justiciable injury. And I would say more broadly, you know, lots and lots of voters live in a district where either because of geography or because of state action, they're not going to have their preferred candidate elected. Indeed, I'd go further and say most Americans don't get their preferred candidate elected because they have to choose from the candidates that are before them. And maybe based on the district they live in, it tends to give them a relatively liberal Democrat or a relatively conservative Republican when really what they prefer is somebody down the middle. And none of those things, I think, are things that you are constitutionally entitled to. Mr. Clement, would your position require us to overrule Davis versus Bandemir? I think, Mr. Chief Justice, it would depend on which way you decided the case. Well, if we decided it in your favor, would it require us to overrule? And it would still depend, Your Honor, on whether you decided it in our favor on standing grounds or on justiciability grounds. If you decided it in our favor on justiciability grounds, I think you would have to overrule the Bandemir case. I think the Bandemir case is a case that well deserves overruling, and I'm happy to discuss why that is the case. I certainly think, as Justice Scalia pointed out, for four justices in Vieth, it is a case that uniquely has no reliance interests on it other than the potential reliance interests of litigants. But it hasn't produced actual results, and I think, as Justice Scalia said, it's a decision that sort of triply doesn't have a strong claim to stare decisis. But I also think if you decided the case on standing grounds, you would really be deciding the case on grounds that are actually interior to anything the Court decided definitively in Bandemir. So I really think it does depend on how you decide the case in our favor as to whether you need to overrule Bandemir. Mr. Clement, if I understand the bottom line of your argument, you would answer the question that one of my – I don't want to call him a former colleague. He's still a colleague, but no longer on the bench with us, Justice Kennedy asked, in one of these cases. And it was if a state constitution had a provision that required redistricting to be based solely on partisan grounds. Forget about whether they were meeting any other traditional grounds or not. You would say that was constitutional. Well, actually, Justice Sotomayor, I think I might say to that particular hypo, and I think it matters how you frame it. I mean, I do think that if you took a state constitutional provision and tried to have it impose some requirements that's going to apply to every redistricting going forward, there's at least an argument that there's actually an election clause problem with that effort to try to control subsequent redistricting efforts. You may or may not accept that argument. You're basically saying yes. That would mean, as occurred here, that almost 50 percent of one party's vote is going to result in maybe less than one-third of their representation in Congress. That's exactly right, Justice Sotomayor. And I think you put your finger on what my friends on the other side perceive to be the problem, which is a lack of proportional representation. No, because all of the tests that they're proposing and that the district court looked at didn't talk about proportionate representation. It looked at only the opportunity to elect. An opportunity is different. The way this is structured, there is absolutely no opportunity to, not none, but virtually none. I'm exaggerating slightly, but virtually none for maybe a majority party to elect more than or less than a third of the people they voted for. Well, I think that that difference, first of all, I think that difference is implicit in the idea of having districts rather than statewide elections for the Congress. And keep in mind that the Constitution as originally enacted, there's now a statute that changes this, but for constitutional purposes, it is perfectly constitutional for a state to embrace the policy idea that proportional representation is a good thing and implement it by saying, we're going to elect Congress not by districts, but by statewide votes. Can I take you back to the Justice Kennedy question that Justice Sotomayor talked about? I wasn't quite sure I understood your answer, and I'll say the question in a little bit of a different way. Sure. Because it seems to me that this is kind of Justice Kennedy's hypothetical come to life, in this sense that there is a particular provision in the legislation here that says the partisan makeup of the congressional delegation is 10 Republicans and 3 Democrats, and the committee shall make reasonable efforts to construct districts to maintain that current partisan makeup, 10 and 3. So it was specifically written into the law that whatever else you do, and there were definitely other things that the lawmakers wanted done, but whatever else you do, go come back with the same 10 and 3. And I think that that was the import of Justice Kennedy's question. It's like, can you write that into a law and say, that's what we're trying to do here? So, Justice Kagan, two responses. One is, I did notice every time Justice Kennedy asked that question, he did ask it the way that Justice Sotomayor did, and built in this notion that you were going to permanently enshrine that preference for future elections. So I do just want to drop the footnote that I think there may be something distinctly This seems pretty enshrined. Go do a 10 and 3. That's the current. That's what we want to maintain. But no, I think there's a difference. But I'm happy to respond to your question about can you have it as an express criterion for a particular districting? And I think the answer, sort of obviously given who I'm representing, is absolutely yes, that's not a problem. And by the way, I think actually being candid about it probably serves accountability principles in the long run. Which is to say, if you think, which I think almost everybody does, that implicitly, that's what the Republican legislature was doing in Vandermeer. In fact, they were explicit in their deposition testimony, if you look at footnote 5 of Justice White's opinion, that the people who drew that map, the Speaker of the Republican House of Indiana, was expressed that his goal was to preserve as many Republican incumbents as possible. Can I take you back to the way Justice Kennedy formulated the question, which hypothesized the provision of a state constitution? And you made reference to the Elections Clause. The Elections Clause says that it is to be prescribed by the times, places, and manners, or to be prescribed by the legislatures of the state. Do the legislatures of the state typically control what is in the state constitution? They don't, Justice Alito, and that's why I do think it is important to figure out, I mean I think Justice Kennedy may have framed that question in a particular way. I don't want to go too far down the road of relitigating the Arizona independent redistricting case here, but I do think there is a certainly respectable argument that state legislature means state legislature, and not the other parts of the state government, and that's why I do think there are separate issues. It can mean the people. It's done by referendum. It well could, Justice Ginsburg, and indeed there are at least four people that agreed with you on that proposition. And I don't want to relitigate that here, because I don't think the result in that case, I think that case can be taken as a given, and you can still say that the claims here are not justiciable, and to be as responsive as I can to Justice Kagan's question, I don't think there is a constitutional problem when a state legislature makes explicit, with respect to the redistricting they're undertaking at that moment, if they make explicit what was ultimately explicit after the record was built up in Vandermeer and Veith, which is it just didn't happen that they got a map that was favorable to Republicans, that they actually intended to do that, along with traditional redistricting principles, and I think, Justice Kagan, the way you read the criteria is exactly right. With respect to partisan advantage, as they called it, they said reasonable efforts will be made. With respect to other items on their list of criteria, like contiguity, they said shall. So some things were non-negotiable, like contiguousness and equal population. Other things were negotiable, but reasonable efforts would be made. Mr. Clement, along those lines, in terms of democratic accountability on this, one of the arguments that we've heard is that the Court must act because nobody else can as a practical matter. But given Arizona, and that is the holding of the Court, is that true? And to what extent have states, through their initiatives, citizen initiatives, or at the ballot box, in elections, through their legislatures, amended their constitutions or otherwise provided for remedies in this area? I just happen to know my home state of Colorado, this last November, had such a referendum on the ballot that passed overwhelmingly, as I recall. So I believe there are others, and I'm just wondering, what's the scope of the problem here? I also know there are five states with only a single representative in Congress, so presumably this isn't a problem there. That's right, and to the extent it's a problem at all, the scope of the issue, shall we say, is roughly 30 states that don't have some kind of mechanism like you've described, or have multiple districts. My sense is there's a lot of movement in this area. I believe there were four or five states, along with Colorado, just this last election that acted. That's exactly right. Michigan is another state that passed a ballot initiative. And of course, the other place where there can be a solution to this, which is the most obvious one and is a solution no matter what you think of the Arizona independent case, is Congress. And if you look at H.R. 1, the very first bill that the new Congress put on their agenda, it was an effort to essentially force states to have bipartisan commissions. Now, query whether that's constitutional, but it certainly shows that Congress is able to take action in this particular area. Well, I suppose the members of Congress are pretty happy with the way the districting has been done. Well, you might think, Mr. Chief Justice, but actually I don't think the majority of them are, because that was a bill that I think passed on party-line votes. And so, I mean, to the extent that the justices of this court in the past have been concerned about things like entrenchment and the like, I mean, it's a little odd here that we've had all of this supposedly partisan redistricting to benefit the composition of Congress, and yet a majority of Congress thinks that they should pass H.R. 1. So, I just don't know that there really is that much of a problem. And I do think it's, you know, the particular context that arises here is the context of congressional redistricting. And one of the elements of the framers' structural solution was they didn't directly tell Congress, why don't you district for yourself? They said, in the first instance, let's have somebody else at the state level closer to the people do the districting, and then we'll give Congress a role to supervise that. So, they didn't have sort of the same fox guarding the same hen house in this particular context. Imagine, you may not want to answer this question, which I understand. You might not have thought about it. But assume that absolutely this is illegal or unconstitutional. But there's no remedy. We can't figure out a remedy. All right, that's where I want you to start. Now, I tried one in V, you know, and my guess is from the reaction it was none, and so probably there's something wrong with it. But what I'm trying to do is to figure out if there's a way to catch real outliers. Just, you can't go beyond that. I mean, at the moment, I'm assuming. The real outliers. So, which are the real outliers? Now, if we look at history, there wasn't that much gerrymandering in the past, compared to what there might be with computers in the future. Okay? So, I've tried to figure out something simple. Not going to get every judge in the country mixed up. Not going to lead to every election contested and throw it all to the judges instead of the people. Okay? Anybody can figure it out. Now, this is what it is. That if a gerrymander is unconstitutional. If there's a commission or something, forget it. You're out of court right away. Okay? But if there is no commission, one party controls it. Then, a gerrymander is unconstitutional. If a party that wins a majority of the votes in the states, and they've won a majority of the votes, but the other party gets more than two-thirds of the seats. Okay? That would be pretty extreme. But your client might meet it. And the virtue of it, it's absolutely simple. By the way, they can try to justify it, and then we can use, you know, the Landis' era, you know, something like those 5% things to test the justifications. But there won't be much that can be justified. It could be a starting place. And that two-thirds number is not drawn out of thin air. The Constitution, in fact, you can find serious matters, overriding vetoes, constitutional amendments, and you can show how just gerrymandering wrecks what they assumed for those. But that's a different story you can find. And it very rarely would operate, but it would be somewhere. Now, have you thought about anything like that? Do you have any reaction? Your reaction would be, no, that's no good. But aside from that, is there anything you want to contribute to thought on that? Well, Justice Breyer, in all candor, there's so much in that that I disagree with that it's a little hard to know where to start. All right. I'm going to resist at first the temptation to take issue with the premises. So if I have time, I'll get back to that. Let me take issue with the two basic prongs of your test. So, first, the reason I think your test has to be a nonstarter is the fact that, as you say, your test would basically give a pass to any state that doesn't use the method prescribed by the framers to engage in congressional districting. So it would be a strike against the state if they actually did what the framers envisioned, which is have a legislature. Justice Breyer, I'm just saying this is perhaps a start. I'm not saying anybody gets a pass. I'm saying you wouldn't have to go further than that in this case. Well, I thought I heard you say that if you were a state that used a bipartisan commission, dot, dot, dot, you would get a pass. And that seems to me itself to be remarkably revealing because you're basically saying that it would be a good thing for the state if they chose to use a mechanism other than the one that the framers picked. So that's my big objection to the intent prong. Not if you say that for this purpose, the legislature is the people, and that's what Arizona held. Well, Justice Ginsburg, in fairness, I think what Arizona held is that the people are within that concept, but I certainly don't think Arizona stands for the proposition that what the framers had in mind primarily was something other than the state legislatures. So it seems to me it's a strike against your test that it identifies as a problem something that the framers would have associated with the primary mechanism they used for redistricting. If I could just interrupt for one second. I mean, going down that road would suggest that Justice Gorsuch's attempt to sort of say this is not so bad because the people can fix it is not so true because you're suggesting that the people really maybe can't fix it, you were wrong about the people being able to fix it, and if the people could fix it, well, it's not the constitutionally prescribed way because it's never been done before. So Justice Gorsuch's attempts to save what's so dramatically wrong here, which is the court leaving this all to professional politicians who have an interest in districting according to their own partisan interest, seems to fail. Well, I would disagree, Justice Kagan. I mean, I took to the import of Justice Gorsuch's question being, you know, maybe we can allow the states to solve this problem for themselves. But I think then when you get at the starting point of Justice Breyer's question, which is at a certain point, the federal government through its justices and judges are going to intervene and put limits on what the state does. Well, I've got this point. But what I'm trying to get you to focus on, because I've read the briefs, you know, this is the fourth time and I think, but the thing that I want you to focus on, if you can, if you want to, is the two-thirds majority idea. Look, my party got a majority of the votes in the state, but we ended up with less than a third of the seats. You see, I said my tone of voice is meant to be, gee, this is really extraordinary. But there is absolutely a workable standard. Now, the next question is all the constitutional arguments you're raising. I'm not pushing those under the rug. But for present purposes, I want you to see if there's any reaction to the practicality of this standard. Well, I think the way I would respond to that, Justice Breyer, is I am not here to tell you that if the Constitution included a one-standard deviation from proportional representation clause or a one-third, two-thirds clause, that judges somehow would be incapable of administering that clause. So I think the fundamental problem is there is no one-standard deviation from proportional representation clause in the Constitution. And, indeed, you can't talk even generally about outliers or extremity unless you know what it is you're deviating from. And I take it implicit in your question and implicit in Justice Sotomayor's question that what's bothering people is a deviation from a principle of proportional representation. Well, Mr. Clement, you keep saying that, but I don't quite think that that's right given the statistical analysis in this case. I mean, you're quite right that this court in the past has said this country does not run on proportional representation and this is a hang-up in our ability to solve this problem. But what's quite interesting about the statistical analysis in this case is that quite a lot of it does not run off a proportional representation benchmark. In other words, all the computer simulations, all the 25,000 maps, right, really do take the political geography of the state as a given. So if Democrats are clustered and Republicans aren't, that's in the program. And all the other redistricting requirements or preferences like contiguity, like following natural boundaries, that's all in the program. So the benchmark is not proportional representation. The benchmark is the natural political geography of the state plus all the districting criteria except for partisanship. And if you run those maps, right, what did you get? You got 24,000 maps and this and 99% of them, 99 plus percent of them, were on one side of the map that was picked here. All of those maps show that a 10-3 configuration is not the natural one. And it's not the natural one not because it's not proportional representation. It's just not the way anybody can district given the actual political geography on the ground unless you absolutely try to overrule that political geography. So Justice Kagan, two points. One is, I mean, I'm happy to respond to the maps, but I do think Justice Breyer, in fairness, did build in the notion of proportional representation. No, I don't. Well, it does for this reason. The reason is all it says is important. Justice, I want you to come back to Justice Breyer's question, but I want you to ask my answer first. I hear one-third, two-thirds, and I sure thought we were talking about proportional representation. As to the maps, you know what I found striking about the maps, and I think this is different from what you found striking about the maps. But first of all, you can do this 24,000 different ways. So that seems like this is about as discretionary a government function as one could imagine. And if you go all the way back to Marbury versus Madison and what makes something a political question, it is a purely discretionary function. You can do this 24,000 different ways. The second thing I found- Stop making lemonade out of lemons. Well, let me try to make- You can do it 24,000 different ways and 23,999 produce an outcome that is less partisan than the one the legislature picked here. See, what I think is remarkable is actually that with the statistics show, and this is on page 162 of the JSA, is that if you run 24,000 maps with partisanship taken out entirely and you just use traditional principles, you get 162 different maps that produce a 10-3 Republican split. So, yeah, it's 1%. It's 0.7%. I mean, 0.7%, just to be clear. That's 162 different ways to get to a 10-3 map that didn't take politics into account at all. If you have 24,000 maps that satisfy all of the so-called neutral criteria that you put in your computer program, don't you need a criterion or criteria for deciding which of the 24,000 maps you're going to choose? And implicit in Justice Kagan's comments is the idea, is it not, that you have to choose one that honors proportional representation. You have no other criteria for distinguishing among the 24,000 maps. I think that's right. At a bare minimum, it has to be that those 162, because they're over here, are off-limits. Mr. Clement, let's go back to the why of that. You keep talking about proportional representation, but it's not, because what was shown is that 99% of the time you get a map that is more fair to both parties than the one that was chosen. And so the issue is you can have 162, 164, but what you can't do in picking that 1% of a map is discriminate against a group of people based on their political views. We have a region of cases that say you can't treat political parties differently because it's an equal protection violation. And it's the same thing whether it's because of their speech or their activities. What we're telling you is pick any other map you want. Just don't split counties, as was done here, based solely on your political views, because counties were split. Don't pick, or you may use saving an incumbent, but don't kick one out, because by kicking one out, and there is a map that would keep all of the incumbents in place, don't kick one out because you're excluding people based on their political views. This is what this is about. You're discriminating on the basis of a group's speech and diluting their vote accordingly. So, Justice Sotomayor, I would have three points if I could get them out. One is, the key word in your question is fair. And what makes this unfair, I would submit at the end of the day, is some principle of proportional representation. Nobody thinks it's unfair, I don't think, that Republicans in Massachusetts, under the current maps, are never going to be able to elect somebody to Congress, even though there's something like 35% of the population. Nobody thinks that's unfair, because you really can't draw districts to do it because they're evenly distributed. It might be unfortunate for them, but I don't think it's unfair. And what makes this unfair is some conception of proportional representation and the ability to do it. Yes, that's true. But look, Party A gets, over and over and over, 55% of the votes. Party B, every single time, gets 90% of the seats. Now, if you want to call that proportional representation problem, do it. But I'm limiting to that kind of thing. I mean, it's not proportional representation, it's a problem of seeing a legislature, reflect, to some degree, the views of the majority of people that elect its members. So, Justice Breyer, let me say why I don't think that's such a horrible problem, and let me try to put what's on the other side of the ledger. So, why I don't think that's a horrible problem is, even if it's as you described, what's going to happen in almost every state in the Union, if that happens, is the 55% majority will elect the statewide office, governors, attorneys general, and the like. And the next time around, they're not going to be able to pass a map, and the next time around, it'll probably end up in gridlock and a judicial line drawing, and I don't think that's the happiest result in the world, but it means that you're not going to be able to perpetuate this in the long run. Now, here's what's on the other side of the ledger, and then I'll try to sit down and clarify. Let me give you a different, you know, a 49% state, which is more like what North Carolina is, so a 48 or 49% state might not find it so easy to do that, and yet that 48 or 49% in this map is consistently being represented by 25%, give or take, of the legislature. Well, and I don't think anybody has a solution. I think gerrymandering is sufficiently unpopular as proven by history that the 48% might get elected, but if you're 35%, nobody's got a solution for you. So here's what's on the other side of the ledger, which is, all right, I think these problems, as Justice O'Connor, who probably more than anybody who sat on this court recently, had her finger on the pulse of state electoral politics, said this problem is largely self-healing. But on the other side of the lens, on the other side of the weight, rather, if you get in the business of adjudicating these cases, these cases will come. They will come in large numbers, and they will come on your mandatory appellate jurisdiction. And once you get into the political thicket, you will not get out, and you will tarnish the image of this court for the other cases where it needs that reputation for independence so people can understand the fundamental difference between judging and all other politics. Mr. Clement, do you seriously believe that one person won't vote? I'm sorry? That's exactly what you said, just what you said now. That was the exact same argument about don't go to one person, one vote. The courts are going to be flooded with cases, and they'll never be able to get out of it. That's not what happened. But, Justice Ginsburg, sometimes an argument that's not a great argument in one context turns out to be pretty darn good in another context. And here's the thing. State legislatures can deal perfectly well with a one-person, one-vote requirement. But if you tell state legislatures that are literally divided down the line in the middle with an aisle, a physical aisle between Democrats and Republicans, that they can't take partisanship into account, then you're really either telling them to get out of the business of redistricting entirely, or you're opening yourself up for case after case after case.  Which is, first, isn't proportional representation a judicially manageable standard? Well, it's a difficult standard. It would require answering some questions about where it's baseline, what elections do you get the baselines from, but it could be manageable. And the second is, why can't the Equal Protection Clause be interpreted to require something resembling proportional representation? Because it's entirely ahistorical. And keep in mind, the framers gave state legislatures the choice of ensuring proportional representation by having statewide elections, but they also gave them the choice to districts, which is fundamentally inconsistent with that. Thank you. Thank you, Counsel. Mr. Bondurant. Mr. Chief Justice, may it please the Court. This case involves the most extreme partisan gerrymander to rig congressional elections that has been presented to this Court since the one-person, one-vote cases. The North Carolina legislature's defense is equally extreme. They take the position that no matter how predominant the intent, no matter how extreme the effects, there are absolutely no constitutional limitations. When you use the word extreme, that implies a baseline. Extreme compared to what? In this case, it is extreme in comparison to any statistical application of neutral redistricting principles in the context of the political geography of North Carolina. It was statistically impossible to come up with an 11-2 plan. As one of the authors said, we're proposing a 10-3 partisan gerrymander because it's not possible to do an 11-2 plan. The statistics bear that out. Moreover, Dr. Chen's maps, which took every possible criteria that they used that was legitimate, applied them to a thousand randomly drawn maps, showed multiple things. First, that you cannot possibly explain the 10-3 advantage based on political geography, democratic clustering, the application of independent redistricting principles, or pure chance. This is not the result of chance. You can only achieve it by making partisan advantage the predominant motivation. Mr. Clement. The predominant. I understood your brief and your friend on the other side characterized your brief as saying that any element of partisanship was bad. Is that your position? No, Your Honor. Our position is that partisanship has to be at least a material factor, as it is in Arlington Heights or Mount Healthy. But in this case, we proved that was a predominant factor, and that is the ruling of the lower court. Well, I guess it just rephrases the question of what constitutes a material factor. Well, the difference between material and being immaterial, having no consequence, is a very real difference. So just so I understand, any partisanship that has a consequence is impermissible under your view? We do not need to go that far in this case because you have evidence of predominance. That is, this objective, partisan advantage, superseded every other conceivable objective. I understand the view that it's the reality that it's an extreme case, but to state a principle that we're going to be able to apply to other cases, your definition of material is that it has a partisan consequence? It is a material part of the decision as in, for example, firing in Mount Healthy. If that was a material part of the decision of the school board to fire the school teacher, then he had made a prima facie case which could then be defended based on either there were intervening causes, that is, the real reason why she didn't show up to teach, or you have legitimate State interests that are being served. In this case, the North Carolina legislature before, below, did not advocate, contend in any way that there is any legitimate State interest of any kind served by partisan gerrymandering. So you have, under any of your analyses, an Anderson verdict, a clear burden. You have clear vote dilution, intentional vote dilution, carefully thought out, skillfully executed. To get back to questions that were asked before, if you make a list of the so-called neutral criteria, compactness, contiguity, protecting incumbents if that's really neutral, respecting certain natural features of the geography, and you have a computer program that includes all of those and weights them all, and let's assume all of that is neutral, and at the end what you get is a large number of maps that satisfy all those criteria. And I think that's realistic. That's what you will get. And the legislature chooses from among those maps. How do you determine whether that choice is unconstitutional? The choice would be the standards that the Court has traditionally applied. Picking an example, the Island Trees school case in which the Court said that a Democratic school board could not use its discretionary choices to discriminate based on viewpoint by excluding Republican authors and Republican viewpoints. No, no. Can you just answer that question? Because it's a real puzzle to me. So you've got, let's say you've got 100 maps, or you might even have 25. I think you probably have thousands. So you have all of these maps, and you have to choose among them. The legislature chooses among them. And you've already programmed in all of the so-called neutral criteria. How does the legislature go about choosing among those maps? Would anything other than just random choice be satisfactory? The legislature has wide discretion as long as it does not attempt to do two things. Dictate electoral outcomes, favor or disfavor a class of candidates. That is an easy administration. That first one, dictate electoral outcomes, I think is going to turn on numbers, right? How much deviation from proportional representation is enough to dictate an outcome? So aren't we just back in the business of deciding what degree of tolerance we're willing to put up with from proportional representation? We might pluck a number out of the air or see that maybe two-thirds is used for veto override, so we like that. Where are we going to get the number on the business end of this? The business end of it is looking how this is done. This was done by looking at voting history as the best predictor of voting behavior, sorting voters among districts to achieve a particular outcome to guarantee that in 10 districts there would be safe Republican majorities in which the general election is essentially irrelevant and the primary election is the norm. Let me try one more time. So let's say you have a range of outcomes with all these neutral maps that satisfy the neutral criteria, and they extend from 10 to 2 in favor of Republicans to 10 to 2 in favor of Democrats. So which one do you have to choose? 9 to 3 for Republicans, 8 to 4, 6 to 6? Clearly, it's an evidentiary matter in terms of intent. If the predominant intent is to favor one party to penalize another based on their voting history, that goes too far. Isn't that always going to be the case when you deviate too far from 6 to 6 in Justice Alito's hypothetical? It certainly is going to be a question of factual proof. The closer you come to proportional representation, the harder it's going to be for a plaintiff to prove. Well, there we go. I think that's the answer to the question, right? You would like us to mandate proportional representation. Not at all. Our position is you cannot discriminate intentionally against political parties and voters based on their political history. And the further you deviate from proportional representation, the more likely you are to be found guilty of that. It is purely an evidentiary question. This court itself said, in Reynolds, it said again in Lulak, that in a case in which you look statewide and see proportional representation, it is less likely that you have a partisan chairman. We're going to have to, as part of our mandatory jurisdiction, in every single redistricting case, look at the evidence to see why there was a deviation from the norm of proportional representation. That's the ask. You're going to have to look at the case and determine whether or not the plaintiffs proved intentional, predominant, partisan intent to discriminate based on... I would think that would always be present as long as you're deviating from proportional representation. What good reason could there be but partisanship? Not at all. If the legislature in North Carolina could have picked any among hundreds of maps that would have produced either a 7-6, a 6-7, maybe an 8-5 representation. But here, that is not this case. What do we do as well about the fact that about 20 states, as I understand it from your friend on the other side, have dealt with this problem through citizen initiatives as a remedy to deal with this? Including, I think, five of them just this last election and a bunch more on the ballot in the coming election. Why should we wade into this when that alternative exists? The simple answer, Justice Gorsuch, is this. The vast majority of states east of the Mississippi, including specifically North Carolina, do not have citizen initiative. Can you amend your constitutions? That has happened in a lot of states, too. You can only amend the constitution with the approval of the legislature in proposing an amendment that gets to the ballot and is then ratified. And that is not an effective remedy. And the states in which you have independent redistricting commissions are states in which those commissions were adopted over the dead bodies of the legislators by citizen initiative passed overwhelmingly by the citizens in the face of legislative opposition. Mr. Bondurant, what do you do with the fact that partisan identification is not the only basis on which people vote? You see electoral results change dramatically depending, for example, on the particular appeal of individual candidates, turning on who's at the head of the ticket rather than down ticket. And how do you deal with that, those factors that depart from the arguments about the inevitability of electoral results based on partisan identification? Your Honor, the social science and the experts in this field, which included Dr. Hofler, who designed this plan, was the Republican Party's leading redistricting expert. He testified that based on social science and his 20 years of experience in redistricting North Carolina, he could demonstrate that how a small, what are called voter tabulation district voted in past elections, whether Democratic or Republican, was the best predictor of how they would vote in future elections. And that all partisan gerrymandering in the modern era is based on that kind of social science. Well, but the one thing that I forget which brief it is, but it turns out that a lot of the predictions in this area, and I don't know if this applies to North Carolina or not, proved to be very, very long, very often. I mean, you have the famous example in the Vieth case where the argument was this method under challenge would never allow the election of Republican judges. And 15 days after the opinion came down, all the judges were Republican. I mean, even in the more recent cycle, I understand a lot of things that were never supposed to happen, happened. In this case, on this undisputed record, the way this was done was that Dr. Hoffler used a composite of seven statewide elections over four election cycles to come up with a calculation of partisan advantage and predictability. And it predicted 10 Republican districts, and the Republicans won all 10. It predicted three Democratic districts. The Democrats won all 10. In 218, they did the same thing. He used the same methodology in 211 to design the districts that were checked in 212. So, counsel, the reality is that with all statistical models, and we spend our lives based on them, insurance is paid on statistical models. Health insurance premiums are based on statistical models. I'm given to understand by the amicus briefs in this case that nuclear plants are built based on statistical models. The one thing about statistical models is there's always the possibility of an aberration, correct? There is a remote possibility sometimes. And the sometimes happen. That's why they're a probability, right? A possibility. Correct. So, the fact that you have one exception doesn't disprove the rule. Certainly not 100 maps out of 24,000 maps. But the problem I think your side throughout this morning has to deal with, a problem, is from this side of the bench to some people looking at the prior cases, there is a great concern that unless you have a very clear standard, you will turn many, many elections in the United States over to the judges. There's always someone who wants to contest it. They will always find experts of all kinds. And what you'll discover is judges simply deciding too much. I've written about why I don't take that position, et cetera, but I'm not speaking for myself here. I'm speaking as a reader and an understander of what's on the other side. At least one thing. And I think it's important for you and the others to deal square on with that question. And our square on answer to that question is, in this case, we prove beyond a reasonable doubt a predominant partisan intent that was admitted on this record and demonstrated statistically beyond any possibility of dispute. And we have proved an extreme partisan effect, not only on a statewide level, but on a district-specific level. In Dr. Mattingly's chart, six of the districts are extreme statistical outliers that would not be achieved in even one, in some instances, of 24,000 plans. That is this case. Moreover, this Court has held that the Elections Clause is, number one, intended to provide the limits on partisan gerrymandering. Justice Scalia said that in V. And this Court has said the Elections Clause was a limited delegation of power to adopt procedural rules for time, place, and manner, but was not to provide power to dictate electoral outcomes or favor or disfavor a class of candidates. That is an understandable standard that legislators throughout this country can understand. They already have told that you can't discriminate based on political viewpoint. They already have told in redistricting you can't discriminate predominantly based on race. Suppose the legislature had said, we have all these maps we can choose from, but we don't want to be too greedy, so we're going to pick a map solely for the purpose of giving us an advantage. We're going to pick a map that builds in a 7 to 5 advantage for us. Would there be a problem with that? It would be very difficult to prove predominant partisan intent. What if they said it outright? The only reason why we're picking this map is we want to build in a 7 to 5 advantage. If, to take your hypothetical example, if in North Carolina the legislature said, we in our wisdom have decided that the people in Charlotte are going to be represented by a Democrat, the people in Asheville are going to be represented by a Republican, that we're going to split Guilford County and North Carolina A&T to ensure that the students in that school are going to be represented by a Republican in one district and a Republican in another. They would be dictating electoral outcomes even if it were 7 to 6. The whole idea of the democratic process in a general election is the people elect a member of Congress in a general election in which everybody can vote. And when you rig the districts in that manner, you are making the general election irrelevant. You're making the primary election in which only some people can vote. So even if the map provides only a very small partisan advantage, that would be subject to challenging litigation? If, in the facts that I've posited, you had the legislature essentially deciding that the people in X part of the state were going to be represented by a Democrat and the people in Y part of the state were going to be represented by a Republican, that the people in those respective districts of the other persuasions were not going to have a choice, were not going to have an opportunity, that would clearly violate every principle for which this Court has stood. And when you say that, aren't you answering Justice Breyer's question? Yes, all of these things are going to potentially end up in court. Judges are going to have to decide what's the right answer. Quite the contrary, as with the one-person, one-vote rule. If the Court says, as this Court said in term limits and in Cook v. Grayleck, that the elections clause means that the legislature can't put its thumb on the scale and pick winners and losers, dictate electoral outcomes, favor or disfavor a class of candidates, that is a standard that can be understood, that is a standard that legislators will obey, and that is a standard that will reduce, not increase, litigation. Thank you, Counsel. Ms. Riggs? Mr. Chief Justice, and may it please the Court, the North Carolinians who are plaintiffs in this case come before this Court today seeking relief because when the General Assembly enacted an allegedly remedial plan in 2016, its leadership essentially bragged to these voters and the public at large that by enacting a 10-3 plan, it was punishing voters who supported Democratic candidates, and it was going to create districts that would not allow voters in those districts any meaningful ability to use normal Democratic processes to redress infringements on their individual constitutional rights. This case is not the first North Carolina voting case to reach this Court this decade, but it represents the most extreme example of a non-responsive legislature that believes that this Court will implicitly endorse unfettered partisan manipulation in redistricting by declining to rein in this most egregious example. The vote dilution test presented to this Court today is a limited and precise test designed only to impose liability on the worst of the worst cases, thus limiting the number of partisan gerrymandering cases that this Court will see. And under this very limited and precise vote dilution test, a lower Court will apply a three-prong test where all three prongs must be satisfied, and under many of those prongs there are multiple screens to limit the number of plans subject to liability. First, partisan intent has to be proven on a district-specific basis, that is, proving that district lines were drawn to subordinate the adherence of one political party and entrench the power of the party drawing the lines. Second, partisan effect has to be shown at the district-specific and plan-wide levels. The district-specific effect inquiry looks at intentional cracking, the cracking and packing of Democratic clusters or Republican clusters, as it will, and the statewide, the plan-wide inquiry is whether the map as a whole creates a severe and durable effect on the disfavored party. Then finally, the Court asks whether there's any justification at the district-specific level for the cracking and packing observed, and whether plan-wide, the map as a whole is more biased than you would expect, given the state's political geography and use of legitimate, non-discriminatory criteria. What do you deny that builds into this is the idea that we should at least have proportional representation light? Proportional representation is, in a sense, that it is in some way the baseline against which all of this is measured. Not at all, Justice Alito. With the three prongs, there is plenty of room for non-proportional plans. A degree. You don't have to have strict proportional representation, but that's the baseline. That's what you're measuring. Was there a partisan effect? Well, there's a partisan effect because it deviates from some notion of proportional representation. The effects prong and the justification prong do real work to prevent that situation from happening, from this being just a measurement from the deviation. Well, how can that be? Because I would have thought under the effects prong there has to be at least some effect, right? There has to be a district-specific and severe and durable statewide. I got it. I got it. So we have to measure effect from what? So every test that's been presented to this court last year and this year, we talked a lot about last year, the efficiency gap, which is how far a deviation from proportional representation. And we were told I think 6% or 7% of deviation would be okay, and that would not be an untoward effect, but anything above 6% or 7%. Today we're talking about two-thirds as an effect. We need to have a number or some formula to determine what effect is enough to state a claim and what isn't. Otherwise, every case is going to come to this court. And I'm still waiting to hear what that number, what that formula might be other than proportional representation, and we're not going to tell you today just how far deviation would be permissible because that would expose the problem. Several points in response, Justice Gorsuch. The legal standard in question is severe and durable effect. All of the social science is just an evidentiary tool, not a legal tool. Two categories of social science evidence were brought to bear on this question of severe and durable effect. The simulations didn't set a numerical threshold baseline because you see a range of produced plans with varying Democrat-Republican splits using these simulations, and we're giving the legislatures breathing room. But with respect, counsel, and I'm sorry to interrupt, but breathing room from what? Breathing room to... How much breathing room from what standard? And isn't the answer that you just... I understand you don't want to give it, but isn't the real answer here breathing room from proportional representation up to maybe 7%? No. If it's not that, then what is this breathing room, and where does it exist? Breathing room exists in the bell curve of expected and reasonable map allocations of representation. It's breathing room to employ some political consideration. It's breathing room... Well, mine isn't the answer to Justice Gorsuch's question, that what's not allowed is deviation from whatever the state would have come up with absent these partisan considerations. In other words, the state can do whatever it wants. It can depart from proportional representation however much it wants to, however much the natural features of the state would suggest. It can come up with something that's not proportional representation at all. What it can't do is deviate from that based on partisan considerations. Isn't that what this test is essentially driving at? That gets at the effects problem. I think that's a great encapsulation. But you would still potentially lack discriminatory effects, and it really is a question of whether the line-drawing party is imposing upon a disfavored party a severe and durable effect. Counsel, I get that you've wisely adopted a very fine answer given for you. But I guess my question is, once we control for geography, once we control for all those things, we're going to have hundreds and hundreds of maps, as Justice Alito has pointed out. Computers spit them out infinitely now. And once we say, okay, all these other factors are controlled for, we can do a regression analysis, control for geography and all these things. We're still going to have hundreds of maps. The legislature is going to choose one. And at that point, we have to say, what's the range of permissible options? And from that, we need a baseline. And the baseline, I still think, if it's not proportional representation, what is the baseline that you would have us use? Controlling for geography and everything else. Well, the geography is baked into that bell curve. It's baked in. I accept that. We agree on that. You and I actually agree on that. So after that, when we're left with, we've thrown out millions of maps, we're only left with a mere few thousand. Okay? What deviation? From what to what? If what we're left with is no extreme statistical outlier or no grossly asymmetrical map, the legislature can choose from any of those plans. Counsel, what is wrong with proportional representation? There are certainly states where the natural geography of the state doesn't lend itself to proportional representation. We live in a system with single member. If you were cracking or packing to get to proportional representation, would that, in your view, be unconstitutional? This court has endorsed that kind of activity in GAFNI, where a legislature is striving for proportional representation. Our test would not invalidate a plan like GAFNI because it would not have a statewide severe and durable effect, and it would be something that you would see within the simulation. Do you agree with Mr. Clement that the Constitution does not require proportional representation or require something close to proportional representation? The Constitution does not require it. But what we see here in this test that we've employed, Justice Roberts, to get to one of your earlier questions, is a test that employs a durability inquiry and sensitivity testing, technology that was not in existence in Vieth and Vandemer and the Republican judges' case in the 1990s, and that map drawers are using right now. If there is a plan where under any plausible shift of voter sentiment, the bias across the plan would disappear, that plan would not be unconstitutional. Again, this is an enormous screen to the kinds of plans that would be subject to liability. Our proposed test, the one adopted by the district court, is so exacting that it narrows dramatically the number of plans subject to scrutiny and leaves legislatures lots of breathing room. Am I right to understand that your test allows a greater degree of partisanship in redistricting than Mr. Mondrant's? I think they're complementary tests depending on how you understand the constitutional harm. Where we see the vote dilution test based on the one-person, one-vote and the racial vote dilution framework, we see those tests as allowing room for some political considerations, particularly the ones endorsed by this court. But it's just a different approach to the same problem. We do believe that our test is narrow and descriptive enough that it gives legislatures guidance on what to do to make sure that they stay on the right side of the Constitution and gives lower courts something very manageable to apply and to grapple with, and that the pleading standards are going to be very high. To prove a severe and durable effect is not to just allege it. It's to come forward with rigorous statistical evidence that supports this situation. I took some of your argument in the briefs, in the amicus briefs, to be that extreme partisan gerrymandering is a real problem for our democracy. I'm not going to dispute that. And that the court, even though it might be a problem to get involved in all these cases, should, in essence, recognize the emergency situation from your perspective. But what about, to pick up on something Justice Gorsuch said earlier, that there is a fair amount of activity going on in the states on redistricting and attention in Congress and in state supreme courts. In other words, have we really reached the moment, even though it would be a big lift for this court to get involved, where the other actors can't do it? The North Carolinian plaintiffs in front of you can do nothing to solve this problem. But I'm thinking about more nationally. The amicus briefs are certainly referencing a problem in many states. And the idea, I think, in the briefs is this court and this court alone can step in. And there is a fair amount of activity going on in the states, recognizing the same problem that you're recognizing. And as Mr. Bondra acknowledged, east of the Mississippi there's a very small number of states where this is a possibility. This court has rightfully been concerned about the burden on the court and the reputation of the court. That's on initiatives, right? And even there, I mean, New Jersey, Michigan, Ohio have dealt with this in some way, just to pick a few that I've got in front of me. But you also have the state supreme court option, as Justice Kavanaugh pointed out. And we often overlook that possibility in our federal system. What do we do about that? Other options don't relieve this court of its duty to vindicate constitutional rights. And certainly while the reputation of the court as an independent check is an important consideration, understand that on the facts of this case, the reputational risk to the court of doing nothing, when David Lewis says, I'm going to draw a 10-3 plan, and if I could draw an 11-2 plan, I would, the reputational risk of doing something is much, much less than the reputational risk of doing nothing, which will be read as a green light for this kind of discriminatory rhetoric and manipulation in redistricting from here on out. This is a situation where, with all due respect, Justice Conner was not correct. This isn't self-correcting. Voters in North Carolina, no matter what level they turn out, this was a swing election in 2018 for North Carolina voters, and they were not able to eliminate the bias in the plans. The techniques are so sophisticated now that there's no room for self-correction. If we look at the popular vote for the House of Representatives nationally in the 2018 election and compare that to the percentage of seats won by the two parties, to what degree do they diverge? I don't know the answer to that question off the top of my head. I know there was a five-point advantage for North Carolina Democrats in 2018. This is a great national problem. Would we see a great divergence there if we look at the statistics across the whole country? There's not gerrymandering in every state. In fact, our brief points out the fact that most plans are symmetrical. Gerrymandering isn't in every state, and so I don't think that metric is particularly informative on that front. Thank you, Counsel. Two minutes, Mr. Clement. Thank you, Your Honors. Just a few points in two minutes. First, I do think at a very fundamental level, my friends on the other side are the victim of their own technology because they have produced 24,000 maps that are permissible maps that don't take partisanship into account at all, and their submission is that a legislature organized on partisanship lines cannot take partisanship into account to any material degree in picking among the 24,000 maps, and that's just an argument ultimately to reassign this authority away from state legislatures and to somebody else who doesn't have a partisanship interest or a partisanship organization. That's just not true because what they have shown is if you don't use partisanship as the predominant factor, then you can produce a lot of maps that are not this one. That's what they have shown. Right, but you can also pick 162 that are this map, and how is a partisan legislature supposed to choose from among those maps if they can't take partisanship? They can choose the one criteria that intentionally and invidiously looks to exclude the other party. That's their basic point. That was the basic point of the judge below. That's right. So you're basically asking state legislatures not to act as state legislatures, and let me just finish with this observation, which is a lot of hard constitutional issues come before this court because you're dealing with something that was unknown to the framing generation, but the framing generation understood partisan gerrymandering firsthand. James Madison was the intended target of a partisan gerrymander by Patrick Henry. He complained about it bitterly. So did George Washington. Neither of them contemplated suit. Hamilton actually suggested to John Jay that the Federalists ought to partisanly gerrymander the Electoral College for the 1800 presidential election. John Jay said it wasn't such a good idea. All three authors of the Federalist papers knew about this and didn't think there was a judicial solution. Thank you. Thank you, counsel. The case is submitted.